**FILED**

**June 8, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 21-0610, *State of West Virginia ex rel. Surnaik Holdings of WV, LLC v. The Honorable*

*Thomas A. Bedell, Sitting by Assignment as Judge of the Circuit Court of Wood County;*

*and Paul Snider*

Armstead, Justice, concurring, in part, and dissenting, in part:

The petitioner in this matter, Surnaik Holdings of WV, LLC, ("Surnaik")

requests this Court to prohibit the circuit court from enforcing an order certifying a class

of individuals, businesses, and government entities that allegedly suffered adverse effects

from a warehouse fire that occurred in Parkersburg in October 2017.[1]   According to

Surnaik, class certification is improper because the "overwhelming majority" of class

members have not been injured, because proving the class members' alleged injuries will

require individual proof,[2] because the class members are not ascertainable, because the

claims of the class representative (respondent Paul Snider) are not typical of the class, and

because the migration of smoke and fumes across a class member's property is not

actionable.  The majority opinion rejects these arguments, and I concur with much of the

---

[1] As the majority opinion notes, we prohibited the circuit court from
enforcing a previous class certification order in *State ex rel. Surnaik Holdings of WV, LLC
v. Bedell*, 244 W. Va. 248, 852 S.E.2d 748 (2020), because we found that the circuit court
failed to conduct a thorough analysis of the class certification requirements contained in
Rule 23 of the West Virginia Rules of Civil Procedure.  *Id.* at 251, 852 S.E.2d at 751.

[2] In a closely related assignment of error, Surnaik contends that "no single
proximate injury applies equally to each class member" and that federal courts "invariably
refuse to certify similar personal injury claims."

majority opinion's analysis. Nevertheless, I remain convinced that individual questions of fact predominate in this matter and render class certification inappropriate. Accordingly, I respectfully dissent and would grant the writ of prohibition.

**Predominance Analysis.**

For a class to be certified under Rule 23(b)(3) of the West Virginia Rules of Civil Procedure, "questions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members . . . ." W. Va. R. Civ. P. 23(b)(3) [eff. 2017]. Whether common questions "predominate" over individual questions is an issue that requires "thorough analysis" and "includes (1) identifying the parties' claims . . . and their respective elements; (2) determining whether these issues are common questions or individual questions *by analyzing how each party will prove them at trial*; and (3) determining whether the common questions predominate." Syl. Pt. 7, in part, *State ex rel. Surnaik Holdings of WV, LLC v. Bedell*, 244 W. Va. 248, 852 S.E.2d 748 (2020) (emphasis added). Individual questions are those "where 'members of a proposed class will need to present evidence that varies from member to member[.]'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196–197 (5th ed. 2012)). Common questions are those "where 'the same evidence will suffice for each member to make a prima facie showing [or] [where] the issue[s] [are] susceptible to generalized, class-wide proof.'" *Id.* (first alteration in original). We have held that "circuit courts should assess predominance with its overarching purpose in mind—namely, ensuring that a class action would *achieve*

2

*economies of time, effort, and expense*, and promote uniformity of decision as to persons similarly situated, *without sacrificing procedural fairness* or bringing about other undesirable results." *Surnaik*, 244 W. Va. at ___, 852 S.E.2d at 750, syl. pt. 7, in part (emphasis added). Inefficiency is present when there is a "line of thousands of class members waiting their turn to offer testimony and evidence on individual issues." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018). "[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate its . . . defenses to individual claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (invoking the Rules Enabling Act, 28 U.S.C. § 2072(b)).

**Predominance of Individual Questions Regarding Injury.**

In this case, the circuit court has certified a class seeking damages for, among other things, personal injuries, damage to real property, and loss of use and enjoyment of real property. As the majority opinion observes, class membership is defined in reference to

> geographic areas (called "isopleths") surrounding the burned warehouse . . . [that] met two conditions: beginning with the start of the warehouse fire, (1) there were concentrations of fine particles 2.5 micrometers or less in size ("PM2.5") that had been emitted by the fire; and (2) the fine particles averaged three micrograms per cubic meter ("3 ug/m³") or more over any twenty-four-hour period during the fire.

This threshold concentration of fine particulate matter stems from an expert report prepared by Michael McCawley, Ph.D. According to Dr. McCawley's report, "PM2.5 exposure in excess of 3 μg/m³ from the warehouse fire particulate is sufficient to cause inflammation

3

and subsequent harm to humans exposed to it[,]" and such "inflammation caused by exposure to the above-mentioned particulate concentration could be sensed by individuals as irritation, particularly to the respiratory tract, including the nose and throat."

However, Dr. McCawley's deposition revealed that not every member of the class would experience an adverse reaction to 3 ug/m$^3$ of PM2.5.  Indeed, according to his testimony the *vast majority* of people exposed to this concentration of fine particulate matter would experience no discomfort at all:

> [T]here's a distribution of people . . . .  So if you're—you know, what was it, .6% of the people are going to die?  So of the .6% of that population, .6% die, well, maybe 10% were feeling sick and *maybe another 20% were feeling uncomfortable*.  That would be the expected sort of distribution that I'm talking about.

(Emphasis added.)

Surnaik calls our attention to this testimony, arguing that class certification is inappropriate "when the number of uninjured class members exceeds a *de minimis* level[.]"  I agree.  "Uninjured class members cannot prevail on the merits,"thus  "their claims must be winnowed away as part of the liability determination." *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619, 624 (D.C. Cir. 2019). Accordingly, the issue becomes "when . . . the need for individualized proof of injury and causation destroy[s] predominance?" *Id.*  However, the *Asacol* court observed,

> this is not a case in which a very small absolute number of class members might be picked off in a manageable, individualized process at or before trial.  Rather, this is a case in which any

class member may be uninjured, and there are apparently *thousands* who in fact suffered no injury.

907 F.3d at 53 (emphasis added). "[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant[.]" *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009). It is difficult to see how common questions can predominate in a case where *seventy percent of the class has suffered no injury* and the injuries that were arguably suffered may vary greatly.

Perhaps recognizing this problem, the circuit court shifted its focus from particulate matter to smoke, finding that "three micrograms of PM2.5 per meter of cubic air over 24 hours is the concentration at which *smoke* is objectively experienced by reasonable people as unpleasant, annoying and irritating[.]" (Emphasis added.) This finding, in turn, allowed the circuit court to find predominance regarding class claims "for property damage [] and especially nuisance or loss of the use and enjoyment of property[.]" Regarding *these* claims, the circuit court found that "common questions related to the duty and breach of duty elements in both nuisance and negligence claims predominate over the individual questions related to damages." According to the circuit court, "individual questions related to causation for these categories of damages . . . would be so minor as to hardly impact the analysis[,]" and individual proof of damages would "involve, in most cases, little more than the testimony and skillful cross-examination of the claimants themselves as to the impact the event had on their lives." The majority opinion essentially adopts this view, finding that "the evidence supports the circuit court's threshold finding that all properties within the geographically designated isopleths, and any individuals

5

within those properties, were exposed to levels of smoke particulates at levels sufficient to cause interference with the use and enjoyment of those properties."

However, these findings by the circuit court are unsupported by the record. Particulate matter is not the same thing as smoke. As the report prepared by William Auberle states, "[t]he plume of smoke from the fire *contained solid particles* (particulate matter) *and a wide range of gaseous pollutants*." (Emphasis added.) Dr. McCawley's report offered an opinion only regarding PM2.5 exposure and resulting inflammation, not regarding exposure to smoke generally and its varieties of particles and gases.[3] Even with respect to PM2.5 exposure, Dr. McCawley's deposition testimony shows that he rejects any claim that exposure at the level of 3 ug/m$^3$ will cause inflammation in every individual or be sensed by all persons.

> Q. .... So when you say, "Exposure in excess of 3 micrograms per cubic meter is sufficient to cause inflammation," you are not testifying that exposure in excess of 3 micrograms per cubic meter will always cause inflammation?
>
> A. That's correct.
>
> Q. .... So to use a hypothetical, if the four of us are in the room and a level of PM2.5 exposure in the air right now is 3 micrograms per meter cubed, some of us might experience inflammation and some of us might not, correct?
>
> A. That's correct.

---

[3] Additional evidence that class members were exposed to peak one-hour concentrations of at least 100 µg/m$^3$ of total suspended particulates ("TSP") does not bolster the circuit court's finding. Though Mr. Auberle is expected to testify that background levels of TSP range from 20 µg/m$^3$ to 35 µg/m$^3$, nothing in Dr. McCawley's report indicates how this concentration of TSP is experienced by humans.

. . . .

Q.    . . . . [Y]ou use [in your report] the phrase "could be sensed."

A.    Correct.

Q.    And so—

A.    It's not going to be a hundred percent.

Q.    So the same thing?

A.    Same thing.

Q.    There could be four of us in this room, 3 micrograms per cubic meter, two of us sense it, two of us don't?

A.    Correct.

Thus, the circuit court had insufficient basis to find that "three micrograms of PM2.5 per meter of cubic air over 24 hours is the concentration at which smoke is objectively experienced by reasonable people as unpleasant, annoying and irritating[.]" In fact, based on testimony from Mr. Snider's own expert, no member of the class can be presumed to have a claim for loss of enjoyment of property. To make such a claim, each of the more than 57,000 members of the class will have to offer individualized proof of how he or she (or, in the case of a business or governmental entity, how its employees or patrons) experienced the smoke and associated particulate matter resulting from the fire. It seems highly unlikely that any two structures have the same susceptibility to smoke infiltration, and relevant inquiries for residential properties might include such things as the age and condition of the structure and whether the occupants were away from their homes. For business properties, similar questions would arise regarding the age and condition of the structure, as well as foot-traffic patterns and the number of customers

7

potentially affected. The parties would have a right to explore these and related matters both at trial and through discovery. It is difficult to see how "mini-trials or bellwether-type trials" will be feasible due to the challenges in determining whether any group of "individuals . . . *experienced similar levels and concentrations* of particulate matter and smoke invasion" in their homes or businesses. (Emphasis added.)

Individualized questions will also arise regarding property damage claims and personal injuries. As the circuit court concedes, "not every issue for every element—especially the element of damages and aspects of causation for claimants alleging bodily injuries—is capable of class wide resolution." The circuit court assumes that property damage claims can be resolved "primarily [by] the individual [c]lass [m]embers' testimony, and any receipts in their possession" and will "not require extensive document or expert discovery." However, this approach does not account for the fact that, on this record, we do not know how many members of the class, if any, have suffered an actual injury to property, and injury is an essential element of a negligence claim. *Wheeling Park Comm'n v. Dattoli*, 237 W. Va. 275, 280, 787 S.E.2d 546, 551 (2016) (quoting *Webb v. Brown & Williamson Tobacco Co.*, 121 W.Va. 115, 118, 2 S.E.2d 898, 899 (1939)) ("[T]o prevail in a negligence suit 'it is incumbent upon the plaintiff to establish, by a preponderance of the testimony, three propositions: (1) A duty which the defendant owes him; (2) A negligent breach of that duty; (3) *injuries received thereby*, resulting proximately from the breach of that duty.'" (emphasis added)); *see also Carter v. Monsanto Co.*, 212 W. Va. 732, 737, 575 S.E.2d 342, 347 (2002) ("[B]efore one can recover under a

tort theory of liability[, including nuisance], he or she must prove each of the four elements of a tort: duty, breach, causation, and damages.").  At present, Mr. Snider is the only named member of the class, and he could not identify any property damage to his home from the fire.

Thus, individual proof of injury will be necessary where *any* member of the class seeks to recover for property damage, and we have no way of knowing whether tens of thousands of class members have suffered any injury at all.  Even if the circuit court's rosy predictions are correct and property damage claims prove relatively simple to litigate, "[t]he need to identify those individuals [whose property has been injured] will predominate and render an adjudication unmanageable absent evidence such as the unrebutted affidavits . . . or some other mechanism that can manageably remove uninjured persons from the class in a manner that protects the parties' rights." *Asacol*, 907 F.3d at 53–54.  However, there is no reason to assume that relevant evidence of property damage claims will be limited to the class members' testimony and receipts.  Ultimately, there is no reason to assume that the parties will forego any lawful means of proving or contesting liability in relation to any class member's alleged injury to property.[4]

A predominance finding is arguably even less tenable for personal injury claims.  Though the circuit court correctly conceded that "individual questions of causation

---

[4] For example, Surnaik might seek to discover and offer proof regarding photographs of properties, prior insurance claims, and the presence of fireplaces and other sources of smoke within a home.  The parties may also wish to introduce scientific testing results or expert testimony.

of bodily injuries will involve document review (mostly medical records) and expert testimony (at least, a medical doctor will have to testify to the diagnosis, specific causation, and ruling out other possible causes)[,]" the circuit court, nonetheless, concluded that "common duty and breach of duty issues ultimately outweigh, and therefore predominate over, any difficulties in managing the individual causation and damages questions" and predicted that "aggregating groups of individual bodily injury claimants according to injury type" may yield "additional efficiencies[.]"

The circuit court's analysis simply does account for the reality that class members may have been exposed to PM2.5 under a variety of different circumstances and the fact that individual questions of proximate causation and differing exposures often render class certification inappropriate. *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 241 F.R.D. 435, 448 (S.D.N.Y. 2007) (noting that "proximate causation often cannot be resolve[d] on a class-wide basis in the case of exposure to a chemical" and that "class certification is often denied in such cases"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 477 (S.D.N.Y. 2005) (observing that "certification is generally granted in a tort case where there is a demonstrated cohesiveness of the class due to a shared experience that is confined in time and place and produces similar effects" and that "[w]here these elements are not present, certification is usually denied"); and *Reilly v. Gould, Inc.*, 965 F. Supp. 588, 602 (M.D. Pa. 1997) (explaining that "it is the presence of additional individualized factors affecting individual plaintiffs which wreaks havoc on the notion that all plaintiffs' injuries have been caused solely by the defendant's

10

actions"). The individual class members may assert claims of injury or damage, and Surnaik may assert particularized defenses, each of which may require careful development of the facts and circumstances surrounding individual class members' exposure to smoke. Pursuing such defenses will require substantial discovery from individual class members and the presentation of individual proof at trial, all of which threatens any attempt to aggregate and try personal injury claims in groups according to the type of injury asserted.

Ultimately, the only substantial common liability issues in this case are those that relate to Surnaik's alleged duty to maintain the warehouse's sprinkler system and Surnaik's alleged breach of this duty. While it is possible that some efficiencies may be obtained from class-wide resolution of these issues, I am not convinced that these issues predominate over the individualized claims and justify class certification. Duty and breach are only two of the three elements that class members must prove to prevail on a negligence claim. *Wheeling Park Comm'n*, 237 W. Va. at 280, 787 S.E.2d at 551. If a plaintiff prevails against Surnaik on the issues of duty and breach of duty with regard to the sprinkler system, any plaintiff in a subsequent claim may arguably invoke the doctrine of collateral estoppel to prevent Surnaik from contesting these issues a second time.[5] Thus, the common questions of duty and breach of duty are not predominant over the individual injury or harm

---

[5] *See* Syl. Pt. 3, *Holloman v. Nationwide Mut. Ins. Co.*, 217 W. Va. 269, 617 S.E.2d 816 (2005) ("'Collateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.' Syllabus Point 1, *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995).").

11

that each individual class member must prove. Accordingly, because I believe that individual issues of fact pertaining to injury and causation predominate in this matter, and because I believe that the circuit court's finding to the contrary was erroneous, I dissent as to the issue of predominance and would grant a writ of prohibition on this basis.